1

2

3

4

5

6        **IN THE UNITED STATES DISTRICT COURT**

7        **FOR THE EASTERN DISTRICT OF CALIFORNIA**

8

| | |
|---|---|
| 9  **SEQUOIA FORESTKEEPER, CENTER** | **1:13-cv-1721  AWI JLT** |
| **FOR BIOLOGICAL DIVERSITY and** | |
| 10  **WESTERN WATERSHED PROJECT,** | |
| 11      **Plaintiffs,** | |
| 12       **vs.** | **MEMORANDUM OPINION AND ORDER ON PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT AND RELATED ORDERS** |
| 13 | |
| 14  **KEVIN ELLIOTT, in his official capacity as** | |
| **Forest Supervisor for the Sequoia National** | |
| 15  **Forest of the U.S. Forest Service , and the** | **Doc. #'s 18, 19, 23 and 24** |
| **UNITED STATES FOREST SERVICE,** | |
| 16 | |
| 17      **Defendants.** | |

18

19       This is an action for declaratory and injunctive relief pursuant to the National

20 Environmental Policy Act ("NEPA") 42 U.S.C. §§ 4321, et seq.  At issue is a planned action by

21 defendant Kevin Elliott in his official capacity as Forest Supervisor for the Sequoia National

22 Forest and the United States Forest Service ("Forest Service") (collectively, ("Defendants") to

23 implement what the parties refer to as the Rancheria Forest Restoration Project ("Project").

24 Plaintiffs Sequoia ForestKeeper ("ForestKeeper"), Centers for Biological Diversity and Western

25 Watershed Project ("Plaintiffs") allege that Defendants violated NEPA during the decision

26 making process by failing to "provide the Plaintiffs and the public with sufficient information

27 during official comment periods to provide meaningful and informed comments prior to issuance

28 of [Defendants'] decision to implement the [Project]."  Doc. # 7 at 2:13-15.  Currently before the

court are cross-motions by Plaintiffs and Defendants for summary judgment.  Also before the court is the motion of Sierra Forest Products to submit a brief as amicus curiae.  Federal subject matter jurisdiction exists over Plaintiffs' claims pursuant to 28 U.S.C. §1331.  Venue is proper in this court.

**JOINT STATEMENT OF UNDISPUTED FACTS**

The parties jointly offer the following facts as undisputed.

The Project is located in Kern County and encompasses 5,880 acres near Rancheria Road in the Greenhorn Mountains of the Sequoia National Forest.  The Project lists three purposes: (1) "Promote a healthy, diverse forest ecosystem that is resilient to the effects of wildfire and other threats, and environmentally, socially, and economically sustainable." (2) Reduce fuels and [forest] stand density to reduce the risk to people, property, and wildlife habitat from uncharacteristically severe wildfire.  (3) restore a structure and function that generally resemble [sic] pre-settlement conditions."  Doc. # 18-2 at 2:24-27.  To realize the purposes of the Project, Defendants considered three options.  The first, Option 1, was the "no action" alternative and requires no further explanation.

Option 2, the option that was eventually adopted, authorized "mechanical thinning, including timber and biomass removal, on 1,102 acres, including 842 acres of natural stands and 260 acres of plantations.  Proposed actions on those 1,102 acres include mechanical thinning of trees 4 to 30 inches in diameter, whole tree yarding, pile burning, underburning, and pine planting."  Doc. # 18-2 at 3:1-4.  Option 2 also authorizes "hand thinning, pile burning, underburning, or jackpot burning on an additional 4,396 acres in natural stands, plantations, meadows, or in goshawk protected activity centers. No treatment is proposed for 381 acres of chaparral within the project area."  Id. at 3:5-9.

Option 3, which was not chosen in favor of Option 2, would have authorized the thinning by hand only of smaller trees; those from 3 to 8 inches in diameter.  Unlike Option2, Option 3 has no commercial timber removal because thinning is limited to small trees having no commercial value.  As the court understands the differences between Options 2 and 3, they boil

down to this: Option 3 is basically a less intense version of Option 2 that limits impacts on the ecology of the Project area by avoiding mechanical thinning (and the attendant potential of disruption to soils and forest floor watershed), partially avoids the removal of high canopy cover by limiting maximum diameter of thinned trees but results in a more limited removal of potential fuel from the understory.

The parties' Joint Statement of Undisputed Facts ("Joint Statement") provides the following information concerning the process leading to the issuance of the Project Environmental Assessment ("EA").  The following information is excerpted or quoted from ¶¶ 11 through 45 of the parties' Joint Statement.

The current iteration of the Project was preceded by a project called the Sawmill Fuels Reduction Project ("Sawmill Project") which incorporated the same general area as the Project. Forest Service issued a decision to proceed on the Sawmill Project in April of 2005.  That decision was successfully administratively appealed by Plaintiff ForestKeeper, who contended that the EA issued for the Sawmill Project "failed to provide an adequate cumulative impacts analysis of past, present and future logging projects that would reduce canopy cover for Old Forest dependent species including the Pacific fisher,[1] California spotted owl, and northern goshawk."  Doc. # 18-2 at 4:6-9.

After reversal of Forest Service's planned Sawmill Project in July of 2005, the Forest Service began a planning forum in 2010 referred to as the Sawmill Project Planning Forum.  A number of stakeholders, including Defendant ForestKeeper participated in the forum, which included three public meetings and a field trip.  "On May 9, 2011, the Sequoia National Forest released its proposal for the Rancheria Project through the NEPA scoping process, seeking comments on the proposal through June 15, 2011."  Id. at 5:1-2.  The Forest Service received

---

[1]  The parties provide a good deal of information regarding the Pacific fisher's environmental requirements, but no description of the animal.  According to the University of California Cooperative Extension Website, ucanr.edu/sites/pacific fisher, the Pacific fisher is a small mammal of the weasel family; larger than a pine martin and smaller than a wolverine.  The Pacific fisher is nocturnal and solitary and is rarely seen by humans.

scoping comments from thirteen of the solicited parties, including from Plaintiff ForestKeeper who submitted seventeen pages of scoping comments as well as several attached exhibits.  As a result of the scoping process, the Forest service released "a more fully developed proposed action for the Rancheria Project," upon which Forest Service sought additional comments through May 23, 2013.  A cover letter accompanying the proposed action explained that:

> [T]he comment period [for the "Proposed Rancheria Forest Restoration Project] would close 30-days after publication of notice in the Porterville Record.  The cover letter further explained that only those who submitted timely, specific written comments during this comment period, or [submitted comments during] the previous scoping period in May and June 2011, would be eligible to appeal the decision, which the Forest Service intended to make in the summer of 2013.  The cover letter and revised proposal document was also sent directly to a list of interested parties, including [Plaintiffs].

Id. at 6:1-7.

The public comment period commenced on April 23, 2013, with the publication of notice in the Porterville Record and the Bakersfield Californian and closed on May 23, 2013.  Plaintiff Center for Biological Diversity submitted a 12-page comment letter on May 15, 2012 and Plaintiffs ForestKeeper and Western Watershed Project submitted a 7-page comment letter and exhibits on May 23, 2013.

Of considerable significance to Plaintiffs' action, several "specialist reports" were reviewed and approved by Forest Service during the 30-day comment period.  Some of these reports were finalized and released to the public before the close of the comment period and some were finalized and released after the comment period had closed.  The specialist reports that were finalized and issued after the close of the comment period include the Air Quality Report, Range Management Report, Socioeconomics Report, Fuels Report, Management Indicator Species Report, Forest Vegetation and Silviculture Report, Wildlife Biological Assessment and Evaluation, Supplemental Biological Evaluation for [Pacific] Fisher, Maps for the Supplemental Biological Evaluations for the Fisher, Appendix A, and Transportation Report.

"On July 5, 2013, Defendant Sequoia Forest Supervisor Elliot issued the Rancheria Project Notice of Decision and Finding of No Significant Impact (FONSI) along with an Environmental Assessment, which included a response to public comments.  Doc. # 18-2 at 7:10-12.  On July 9, 2013, Forest Service staff provided a web address link to various documents, including specialists' reports that were related to the Project in response to the request of Plaintiff ForestKeeper.  On the same date, Plaintiff ForestKeeper sent an email to Forest Service staff noting that Forest Service had not provided a "Preliminary EA," which the attorney considered to be not in keeping with past practice.  The email also opined that the "previous comment period in April-May did not provide sufficient information or any preliminary environmental analysis to provide meaningful comments."  Id. at 7:20-21.  Defendant Elliot responded that the Forest Service was "not required to publish a preliminary or draft Environmental Assessment.

On July 18, 2013, Forest Service released a Supplemental Biological Evaluation for the Pacific fisher, however the corrections did not alter the determination reached in the Fisher Supplemental Biological Evaluation issued on July 3, 2013.  On August 19, 2013, each of the Plaintiff parties filed separate administrative appeals of the Project decision.  The administrative appeals challenged the FONSI on the ground that several of the specialist reports were issued too late to be considered and commented upon during the 30-day comment period.  The parties' administrative appeals were denied on September 25, 2013.  There is no dispute that Plaintiffs have properly exhausted administrative remedies with regard to this action.

The parties have provided a number of joint facts concerning the Pacific fisher.  A few of these are of importance in the discussion that follows.  The entire Project area is contained within the Southern Sierra Fisher Conservation Area ("SSFCA"), which was established in the 2001 Sierra Nevada Forest Plan Amendment.  The project area represents the southern-most

extent of area of Pacific fisher habitation.  Pacific fishers inhabit portions of the western slope of

the Sierra Nevada mountain range at elevations between 3,000 and 8,000 feet.  The parties agree

that "Pacific fishers use habitat with high canopy closure, large trees and snags, large woody

debris, large hardwoods, multiple canopy layers and [avoid] areas lacking overhead canopy

cover."  Id. at 9:27-10:1.

## LEGAL STANDARD

The Parties' cross-motions for summary judgment seek the court's determination of the

question whether Defendants issued the EA and FONSI in violation of the requirements of

NEPA.  A district court reviewing a final agency decision follows the legal standard provided by

the Administrative Procedures Act ("APA").  Pursuant to 5 U.S.C. § 706(2)(A), a reviewing

court may not set aside a final agency decision unless it finds that action to be "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with the law."  Citizens to

Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971).  In applying this standard of

review, the district court bases its decision on the Administrative Record ("AR") the agency

presents to the court.  Florida Power & Light Co. v. Lorion, 470 U.S. 729, 744 (1985).  A court

generally must be 'at its most deferential' when reviewing scientific judgments and technical

analyses within the agency's expertise.  [Citation.]"  N. Plains Res. Council v. Surface Transp.

Bd., 6688 F.3d 1067, 1075 (9th Cir. 2011) (citing Balt. Gas & Elec. Co. v. Natural Res. Def.

Council, Inc., 462 U.S. 87, 103 (1983).  "Judicial review of agency decision-making under

NEPA is limited to the question of whether the agency took a 'hard look' at the proposed action

as required by a strict reading of NEPA's procedural requirements."  Bering Strait Citizens for

Responsible Dev. V. U.S. Army Corps of Eng'rs, 524 F.3d 938, 947 (9th Cir. 2008).

While a reviewing court is highly deferential to the factual determinations of the agency

that are within the expertise of that agency, the review of agency procedure in light of NEPA's

requirements is less deferential.  "The council on Environmental Quality ("CEQ") is charged with promulgating regulations to ensure that the policies and requirements of NEPA will be carried out by federal agencies.  42 U.S.C. §4344."  <u>Sierra Nevada "Forest Protection Campaign v. Weingardt</u>, 376 F.Supp.2d 984, 990 (E.D. Cal. 2005) ("<u>Weingardt</u>").  In particular, those procedural rules that mandate involvement of the public, "to the extent practicable, in preparing an Environmental Assessment. . . ," 40 C.F.R. § 1501.4(b), and mandate "diligent efforts to involve the public in preparing in preparing and implementing their NEPA procedures" by providing "public notice of NEPA-related hearings, public meetings, and the availability of environmental documents so as to inform those persons and agencies who may be interested or affected," 40 C.F.R. §§ 1506.6(a) and (b).  Subsections 1501.4 and 1506.6 are substantive rules whose violation may invalidate an agency action.  <u>Citizens for Better Forestry v. U.S. Dep't Ag.</u>, 341 F.3d 961, 970 (9th Cir. 2003); <u>see also</u> <u>Weingardt</u>, 376 F.Supp.2d at 989-990 ("agency decision taken without the required procedure is 'contrary to law'").

A motion for summary judgment will be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no material issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed.R.Civ.P. 56(c).  Because the court's review of an agency's decision is limited to the AR, resolution of the question presented requires no fact finding and summary judgment is the appropriate means by which the merits of the case can be decided.  <u>Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.</u>, 18 F.3d 1468, 1472 (9th Cir. 1994).

## DISCUSSION

## I. Preliminary Matters

### *A.  Defendants' Motion to Strike Extra-Record Materials*

Defendants seek to strike all or portions of declarations submitted by Plaintiffs on the

ground the portions that are requested to be stricken lie outside the AR and are not properly

sources of evidence for the court's consideration.  The materials Defendants move be stricken

include:

1.  the entirety of the Declaration of Chad Hanson, Doc. # 18-5

2.  the Declaration of Ara Marderosian, Doc. # 18-6, paragraphs 8, 15, 17 and 18.

3.  the Declaration of Ileele Anderson, Doc. # 18-3, paragraphs 14, 15 and 2nd and 3rd

Sentences of paragraph 12;

4.  the Declaration of Michael Connor, Doc.# 18-4, paragraph 11; and

5.  the entirety of Exhibit 7 to Plaintiffs' Motion for Summary Judgment, Doc. # 18-7.

"It is undisputed that the focal point for judicial review [of an agency action under

NEPA] is the administrative record before the agency at the time of the agency's decision and

'not some new record made initially in the reviewing court.' [Citation.]" <u>Sierra Club v. Babbitt</u>,

69 F.Supp.2d 1202, 1209 (E.D. Cal. 1999) (quoting <u>Camp v. Pitts</u>, 411 U.S. 138, 142 (1973).

Defendants accurately enumerate the limited exceptions to the general exclusion if extra-record

materials from the court's consideration.  As Defendants' Motion to Strike states, the exceptions

to courts' generally exclusive reliance on the AR are:

> (1) if necessary to determine the agency has considered all relevant factors
> and has explained its decision, (2) when the agency has relied on
> documents not in the record, [ ] (3) when supplementing the record is
> necessary explain technical terms or complex subject matter, [or] . . . (4)
> when plaintiffs make a showing of agency bad faith.

Doc. # 24 at 5:1-5 (quoting <u>Ctr for Biological Diversity v. U.S. Fish& Wildlife Serv.</u>, 930943

(9th Cir. 2006).  "Additionally, where specific facts must be presented in the form of affidavits

or other evidence to establish standing, the court will take these facts to be true for purposes of a

summary judgment motion.  [Citation.]" <u>Nat. Res. Defense Council v. U.S. Forest Services.</u>,

634 F.Supp.2d 1045, 1052-1053 (E.D. Cal. 2007) (citing <u>Lujan v. Defenders of Wildlife</u>, 504

U.S. 555, 561 (1992)) (hereinafter "NRDC").

In general, Plaintiffs oppose Defendants' motion to strike on the ground that the depositions, or portions thereof, that Defendants seek to strike were not offered as evidence for purposes of the court's assessment of Defendants decision.  Rather, the depositions were offered as statements by representatives of the Plaintiff organizations for the purpose of establishing standing.  The court will consider each of Defendants' motions to strike in light of Plaintiffs' objections.

### 1. *Declaration of Chad Hanson*

Chad Hanson is Plaintiffs' expert with regard to the likely effects of the Project's implementation on habitat quality for the Pacific fisher and the spotted owl.  Hanson's Declaration is devoted to this topic.  Defendants contend that Hanson's declaration does not fall within any of the above-cited exceptions and that it has no relevance to the issue of the procedural violation of NEPA that is alleged by Plaintiffs.  Plaintiffs contend that Hanson's Declaration is necessary to establish the requested remedy of vacatur of Forest Service's decision to implement the Project insofar as it establishes the irreparable harm element of Plaintiffs' request for injunctive relief.

The court agrees that Plaintiffs' challenge to Defendants' decision to implement the Project is based on the allegation of procedural irregularities, not on the technical basis for the decision.  It follows that any equitable remedy the court may impose will necessarily focus on the procedural deficiency identified, if any.  The court also finds that the record adequately identifies Plaintiffs' substantive contentions regarding what they foresee as the Project's impacts on Pacific fisher and spotted owl populations.  The court therefore finds that the Hanson Declaration, to the extent it is relevant to the establishment of any fact regarding remedies available to Plaintiffs is essentially duplicative of information contained in the AR.  The court

will therefore grant Defendants' motion to strike the Hanson Declaration.

### 2. *Declaration of Ara Marderosian*

Defendants request the court strike paragraphs 8, 15 and 17 of the Marderosian Declaration.  The Declaration alleges that Ara Marderosian is the founder and executive director of Plaintiff Sierra ForestKeeper.  The majority of the Declaration alleges facts that go to establish the constitutional standing of Plaintiff ForestKeeper which is not disputed by Defendants.

Paragraph 8 of the Declaration is the last paragraph of a 3-paragraph exposition explaining Plaintiffs' past experience with Forest Service and giving some context to Plaintiffs contention that Defendants were required under the particular facts of this case to issue a draft EA.  In sum, the three-paragraph sequence constitutes an explanation of how ForestKeeper suffered harm as a result of what they contend were procedural irregularities committed by Defendants.  As such, the court interprets paragraph 8 of the Marderosian Declaration to be a legitimate part of the statement establishing Plaintiff ForestKeeper's standing.  Defendants' motion to strike paragraph 8 will be denied.

The court agrees with Defendants that paragraph 15 of the Marderosian Declaration has no apparent relevance to either Plaintiffs' standing or to the nature of the harm suffered by Plaintiffs as a result of the alleged procedural errors.  Defendants' motion to strike paragraph 15 of the Marderosian Declaration will be granted.  Conversely, the court finds that Paragraph 18 of the Marderosian Declaration again goes to an explanation of how Defendants' alleged procedural conduct caused Plaintiffs harm.  Defendants motion to strike the 18th paragraph of the Marderosian Declaration will consequently be denied.

### 3. *Declaration of Ileene Anderson*

Ileene Anderson is a member of Plaintiff Center for Biological Diversity ("Center") and

-10-

works as a Senior Scientist for the Center.  Defendants request that the court strike paragraphs 14 and 15 of the Anderson Declaration, Doc. # 18-3, and strike the second and third sentences of paragraph 12.  The court has examined the Anderson Declaration and finds that paragraphs 14 and 15 are offered to explain how Defendants alleged conduct harmed Center by limiting the scope of information available to Plaintiffs and thereby preventing adequate opportunity for comment by Plaintiffs.  Since the establishment of harm is a necessary element of standing, Defendants' motion to strike paragraphs 14 and 15 will be denied.  Sentences 2 and 3 of paragraph 12 appear, when considered in isolation, to impermissibly state conclusions regarding the environmental effects of implementation of the Project.  However, when considered in the context of the remainder of the paragraph, the two sentences appear to be intended to explain Center's concerns with Defendants' planned Project and their standing to raise issues with regard to implementation of the Project.  Defendants motion to strike the second and third sentences of paragraph 12 of the Anderson Declaration will also be denied.

### 4. Declaration of Michael Connor

Defendants request the court strike Paragraph 11 of the Declaration of Michel Connor ("Connor Declaration").  Connor is a member of Plaintiff Western Watershed Project and is their representative for purposes of this action.  Paragraph 11 of Connor's Declaration is the second paragraph in a 2-paragraph explanation of Western Watershed's prior interactions with Forest Service and makes explicit their allegation that they were not provided a timely description of the Project and its environmental effects.  The court interprets these two paragraphs as part of Western Watersheds' injury and, consequently, its standing.  Defendants' motion to strike paragraph 11 of the Connor Declaration will therefore be denied.

### 5. Exhibit 7

Exhibit 7 of Plaintiffs' motion for summary judgment consists of a set of documents that

pertain to the contract between Forest Service and Sierra Forest Products, the provider of services for the portion of the Project that, under the selected option, will provide commercial tree harvest and removal in those areas of the Project that are to receive that treatment. The court has reviewed the exhibit and its attachments and finds no information is set forth there that is germane to the court's consideration of the Parties' cross-motions. The motion to strike will therefore be granted as to Exhibit 7.

### B.  *Motion of Sierra Forest Products to Appear as Amicus Curiae*

The motion of Sierra Forest Products to appear as Amicus Curiae is denied because the proposed Amicus Brief submitted by them is nothing more than their opinion that Defendants supplied sufficient information concerning the Project from Forest Product's perspective and in consideration of Plaintiffs' experience, sophistication and ability to spot and respond to the important environmental issues. As Plaintiffs point out, the consideration of an amicus brief is solely within the discretion of the court and is seldom appropriate at the level of the trial level where the parties are adequately represented by experienced counsel. See Ryan v. CFTC, 125 F.3d 1062, 1063 (7th Cir. 1997). The court has reviewed the proposed amicus brief by Sierra Forest Products and finds it contains no material that is useful to the court or that is not set forth adequately by the parties. The motion to appear as Amicus Curiae will therefore be denied.

## II.  Cross-Motions for Summary Judgment

### A.  *Extent of Agency Duty to Inform*

At the heart of Plaintiffs' action is the contention that Defendants were required under NEPA to make available to the public the entire body of facts, including specialists' reports, that would be used in reaching a final decision on the proposed Project in time to allow parties to submitting public comments to incorporate these facts or specialists' reports into their comments. Plaintiffs contend that, as a practical matter, the only way Defendants could meet

this requirement in this case would have been to issue the functional equivalent of a preliminary

EA; an action Defendants did not take.  Plaintiffs argue that Defendants failure to be

forthcoming with the specialists' reports in time to allow public comment prior to Defendants'

final decision to issue a FONSI and a decision to approve the Project violated NEPA procedural

rules.  The court begins its analysis by examining the parameters of factual disclosure required

under NEPA.

The current state of the law reflecting the duty of agencies to both provide factual

information on the likely environmental consequences of planned actions and receive and

consider public comment is set forth in a trio of cases cited by both parties.  The first of these is

Citizens for Better Forestry, 341 F.3d 962 (9th Cir. 2003) ("Citizens").  In that case, the

appellate court noted that the plaintiffs were "deprived of the opportunity to comment on the

[defendant's] EA and FONSI at all points in the rulemaking process."  Id. at 970.  The Citizens

court recognized that, while no prior case had established "a minimum level of public comment

and participation required," the public participation requirements of NEPA had to have some

substantive meaning and the complete absence of opportunity for informed public comment

violated the statute.  Id.  Of significance to this action, the Citizens court held, in pertinent part,

that the withholding of information of environmental consequences of planned action and the

failure to allow public comment "undermines the very purpose of NEPA, which is to ensure[ ]

that federal agencies are informed of environmental consequences before making decisions and

that the information [regarding environmental consequences] is available to the public."  Id. at

970-971.

In Weingardt, the second case in the trio, this district court directly addressed the

question of whether a draft EA is required under NEPA under facts that are similar, if not

identical, to the facts of the case at bar.  In Weingardt, two sets of plaintiffs challenged Forest

Service approval of projects authorizing logging in a total of four distinct projects in Northern

California.  Although the procedural path taken by Forest Service is not identical in each of the

four projects, the extensive factual background presented in the District Court's opinion

indicates the Forest Service's processes of consideration and decision in each of the four projects

share features that are typified by Forest Service actions in the project referred to as the "North

49 Project."  The court will briefly recap the facts set forth in <u>Weingardt</u> regarding the "North 49

Project" in order to give adequate context to the decision reached in that case.

        In the North 49 Project, the Forest Service first engaged public participation by notifying

interested parties of an intention to allow logging for the purpose of restoring "fire adapted forest

ecosystems and reduce the risk of wildfires."  <u>Weingardt</u>, 376 F.Supp.2d at 986.  A "scoping

notice" was prepared that included a description of the proposed projects and "approximately

two and one-half pages of discussion of anticipated mitigation measures that would reduce

impacts to wildlife" and invited comments in response.  The parties in <u>Weingardt</u> responded to

the "scoping notice" timely and requested "a copy of any draft EA or [EIS]."  <u>Id.</u> at 987.

        About two months after the "scoping notice" was sent out the Forest Service sent out a

notice that it was initiating "a second [30-day] public comment period as required by 36 C.F.R. §

215.6.  The Forest Service accepted public comments for the statutory 30-day period *after which*

it "prepared a series of internal reports totaling more than three hundred pages that evaluated the

potential impacts of the proposed [projects], including impacts on silvicultural resources,

wildlife, hydrology, sensitive plants, aquatic species and visual resources."  376 F.Supp.2d at

987.  From the internal reports, and presumably in consideration of the public comments, the

"Forest Service prepared a fifty-page EA discussing the impacts of the project, including the

cumulative impacts as well as alternatives to the project in light of the information in the

reports."  <u>Id.</u>  On the same date that the EA was released to the public, the Forest Service issued

a FONSI and a Notice of Decision approving the proposed project.  Id.  Although the details vary slightly from project to project in Weingardt, the shared characteristics in each case reflect that: (1)  the Forest Service invited public comment during a scoping period that typically lacked availability of any detailed information on likely environmental impacts; (2)  following the public comment period allowed during scoping, the Forest Service permitted a second 30-day comment period pursuant to 36 C.F.R. § 215.6; and (3) during the section 215.6 comment period, Forest Service did not make available to the public any of the specialized environmental impact reports that would ultimately form the factual basis for Forest Service's decisions to issue FONSI's with regard to the projects.

The plaintiffs in Weingardt challenged the Forest Service's issuance of a FONSI and the Notice of Decision on the ground that Forest Service had failed "to adequately involve and inform the public in the preparation and consideration of the EA for each of the projects."  Id. at 989.  The parties in Weingardt framed their positions at the two extremes of the issue of duty to inform the public under NEPA; the plaintiffs contending that nothing short of circulation of a draft EA would suffice and Forest Service contending that they had no obligation other than to inform the public that the projects were under consideration and to make the EA available once it was completed.  Id. at 991.

In synthesizing regulatory requirements and case authority, the Weingardt court held that "although the CEQ regulations do not require circulation of a draft EA, they do require that the public be given as much environmental information as is practicable, prior to completion of the EA, so that the public has a sufficient basis to address those subject areas that the agency must consider in preparing the EA.  Depending on the circumstances, the agency could provide adequate information through public meetings or by a reasonably thorough scoping notice"  Id. In reaching this synthesis, the Weingardt court gave particular attention to the sequence of events

prescribed by 40 C.F.R. §§ 1501.4 and 1506.6.  The court noted that these regulations "require that an agency give environmental information to the public *and then* provide an opportunity for informed comments to the agency [. . . .]  This process of disclosing information to the public must occur *before* the agency has reached its final decision on whether to go forward with the project."  Id. at 990 (internal citation to statutes omitted and italics added).

The final case of the trio is Bering Strait Citizens for Responsible Dev. v. U.S. Army Corps of Eng'rs, 524 F.3d 938 (9th Cir. 2008) ("Bering Strait").  Essentially, the appellate court in Bering Strait considered the issue raised in Weingardt in a different factual context and endorsed the approach taken in Weingardt.  The Bering Strait court restated the above-quoted holding from Weingardt as follows:

> The district court in [Weingardt] evaluated this issue soundly, and we commend its approach. As that court observed, "the way in which the information is provided is less important than that a sufficient amount of environmental information – as much as is practicable – be provided so that a member of the public can weigh in on the significant decisions the agency will make in preparing the EA." [Citation.]  Stated another way, we now adopt this rule:  An agency, when preparing an EA, must provide the public with sufficient environmental information, considered in the totality of circumstances, to permit members of the public to weigh in with their views and thus inform the agency decision-making process.

524 F.3d at 953 (internal citation to Weingardt omitted).

**B.  Parties' Contentions**

The central issue presented by both parties is whether Defendants provided information on likely environmental impacts that was both sufficient and timely for purposes of 40 C.F.R. §§ 1501.4 and 1506.6.  The parties' arguments center on the process of informational transfer that occurred at three discrete points during the process of Project development; during the Sawmill Forum, during the scoping period and during the final 30-day section 215.6 comment period. The court will consider the parties contentions with regard to each in turn.

1

2

### 1. *The Sawmill Forum*

The parties agree that the Sawmill Collaborative Forum ("Forum") was instituted in 2010

to restart the earlier, abandoned Sawmill Project.  The parties agree that in conducting the

Forum, Forest Service sought input "from a diverse group of stakeholders and interests, which

included scientists and community leaders from environmental organizations, local government,

wildlife management, air quality, forestry and timber industries, tribal members and

landowners."  Doc. # 18-1 at 7:7-10 (citing AR225[2] and AR2736-37).  Defendants characterize

the Forum meetings as being led by a professional mediator and providing the attendees "with

materials regarding the Project, including scientific literature on the Pacific fisher and technical

reports on potential treatment prescriptions.  Doc. 23-1 at 7:10-12 (citing AR 2711 and 2720).

Plaintiffs make two contentions regarding the Forum.  First, Plaintiffs contend that it

should not be considered as fulfilling or partially fulfilling Defendants' obligations to disclose

pertinent information under DEPA because the Forum was not announced, or open, to the public.

Rather, invitations to participate were sent to individuals identified by Forest Service as stake

holders in the Project.  Plaintiff ForestKeeper alleges that it was invited and participated, as did

Dr. Chad Hanson, who apparently participated in the Forum as an individual prior to his

affiliation with Plaintiffs.  Plaintiffs Center for Biological Diversity and Western Watershed

Projects did not participate.  Plaintiffs allege that information generated through the Forum was

distributed only to those who participated; no information from the Forum was made available

generally to the public.  Second, Plaintiffs contend that, to the extent information regarding

environmental impacts was disseminated or considered during the Forum, the information was

---

[2]    The designation "AR" refers to pages from the administrative record, portions of which are excerpted
and provided in printed format at Doc.# 35.  The complete Administrative Record has been provided to
the court on a compact disc.

general background information and was not information pertaining specifically to the environmental impacts of the Project since the Project had not been formulated at the time of the Forum.

Given that the decision in <u>Bering Strait</u> directs the court to assess the adequacy of an agency's sharing of information with the public according to "the totality of the circumstances," the court finds it must give consideration to the give and take of information that occurred within the Forum. However, the court has examined the portions of the AR referenced by both parties and finds that Plaintiffs are correct in noting that information that disseminated through the Forum process, while it provided information on sensitive species such as the Pacific fisher, did not provide any specific information with regard to the likely effects of the Project on populations of any of the species of concern because there was no specific information on the actions contemplated in the Project. In addition, the court finds it is of some significance that the attendees of the Forum meeting of March 17, 2010, identified the need for Forest Service-generated research to be made available to enable "leverage organizational resources more effectively." AR02714. The court interprets this portion of the meeting minutes as expressing Plaintiffs' (and possibly other participants') expectation that any "original research" done or directed by Forest Service would be provided to the public in order for them to leverage their limited time and resources in responding during comment periods.

### 2. Scoping

The parties agree that the Project was presented for public scoping on May 16, 2011. The documents that initiated the scoping process were a letter from Forest Service explaining the scoping process and an attached 13-page document describing the Project. Defendants refer to this document as the "Scoping Proposal." Defendants characterizes the Scoping Proposal as presenting descriptions of the sensitive species inhabiting areas within the Project area, the

proposed treatments in those areas, and special considerations pertaining to sensitive species including spotted owls and the Pacific fisher.  Plaintiff also points out that the Scoping Proposal points the reader to "the Conservation Biology Institute's report on impacts on the species in the Southern Sierra Nevada (Spencer et al., 2008) (available at AR1999), AR 1702, and specifies the treatment prescriptions for this habitat, including retention of snags and potential nesting sites." Doc. # 23-1 at 8:7-10.  Plaintiffs do not dispute any of Defendants characterizations and the court finds Defendants' characterization is essentially accurate.[3]

Plaintiffs' primary contention with regard to the scoping process is that Forest Service communicated the intention of Forest Service to issue a Draft EA following which Plaintiffs would be permitted to submit further comment.  To support this contention, Plaintiffs cite first a memorandum issued by the Acting District Ranger for the Kern River Ranger District which provided "direction to move forward with a project analysis, [and] which listed responses to Plaintiffs' scoping comments on various issues, including statements that '[r]equested details will be available for public comment in draft NEPA document' (AR 1359), and a '[d]raft EA will be circulated for public comment.  AR1363."  Doc # 18-1 at 8:8-11.  Plaintiffs also allege that on the "following March 18, 2013, Rancheria Project Interdisciplinary Team notes stated that '[t]he preliminary EA is due to the SO [Sequoia Forest Supervisor's Office] on April 9.' AR1353."  Doc. 3 18-1 at 8:11-13.

The court has reviewed the cited portions of the AR and finds they state what Plaintiffs' allege.  However, the nature of the documents is not entirely clear; that is, it is not clear from the titles of the cited documents whether they were intended for public review or whether they

---

[3] The document referred to as "Spencer, et al. 2008" is represented in the Excerpts of the ER by its cover page only.  There being no allegation to the contrary, the court presumes the document was available to Plaintiffs either directly from Defendants or online.

represent internal process documents that were made available only as part of the discovery

process.  Of some significance to the court's analysis, the Forest Service's "Analysis of

Comments" includes an item labeled "Wildlife – Pacific Fisher."  <u>See</u> AR1363.  Under that item,

Forest Service identifies the issue as follows:

> Snag densities are currently too low for fishers; Analyze impacts of forest
> thinning on large down logs for fisher habitat.  Studies show that fisher[s]
> want 65 [down logs] per acre [while] Sequoia Forest only has 19 down
> logs per acre an average based on FIA plots; Why does ecological
> restoration including removal of trees by logging[?]

<u>Id.</u>  Under the heading titled "Resolution/Disposition/Rationale" is entered the statement that

"Project will analyze potential effects to fisher."  <u>Id.</u>

### *3. 30-Day Comment Period Pursuant to Section 215.6*

The final event pertaining to disclosure of information to the public and the receipt of

public input by Forest Service was the statutory 30-day comment period required pursuant to 36

C.F.R. § 215.6.  It is undisputed that the 30-day comment period commenced on April 23, 2013,

with the publication of notice in the Porterville Record and the Bakersfield Californian, two

regional newspapers.  Previously identified parties, including Plaintiffs Sierra ForestKeeper and

Center for Biological Diversity, received notice by mail including a two-page cover letter

explaining the mechanics of submission of comments and 19-page document titled "Proposed

Rancheria Forest Restoration Project" ("Proposed Project Document") which explained the

decision to be made and provided a condensed factual background of the issues that had been

identified in the scoping process.  Among the issues identified in the Proposed Project Document

was the observation that "[r]eduction of canopy cover, snag levels, and downed logs will have an

adverse effect on fisher, spotted owl, and other wildlife species."  AR1336.  The Proposed

Project Document also provided a detailed map showing the treatment to be applied to specific

areas within the Project zone, including the areas identified for mechanical thinning of trees with

diameters from four to thirty inches.  See AR1337-1338.

The final comment period closed on May 23, 2013.  During the comment period Plaintiff Center for Biological Diversity submitted a 12-page comment that generally challenged Defendants assumptions concerning the effect of mixed severity fires, including localized high intensity fires on sensitive species.  See AR1125-1136.  The comment touches briefly on the sensitivity of fishers to mixed severity fires, referring to a study conducted by Plaintiffs' expert, Chad Hanson.  Plaintiffs ForestKeeper and Western Watershed Project submitted a joint 7-page comment letter on May 23, 2013, which was much more explicit and rigorous in challenging the favored action on the basis of its effects on fisher populations and in challenging Forest Service assumptions concerning the effects of mixed severity fires on sensitive species generally.  See AR966-971.

At the center of Plaintiffs' contentions regarding the inadequacy of Defendants' efforts to inform public comment is the undisputed fact that several of the specialized scientific studies that were considered by Defendants in making the decision to issue a FONSI were not released to the public until after the close of the comment period.  Specifically, the Biological Evaluation ("BE") of species within the Project area was not released until July 3, 2013, even though the report itself indicates it was completed as of April 2013.  See AR 470.  Similarly, the Supplemental BE for the Pacific fisher was released on July 3, 2013, as were the maps and appendix for the Supplemental BE .  Of significance from the court's perspective is the fact that the final EA justifying the issuance of the FONSI specifically cites to the Supplemental BE for the fisher in reaching its conclusion.  See AR278.

### C. Analysis

Since the Ninth Circuit's decision in Bering Strait, a number of district court decisions have interpreted its holding that a draft EA is not necessarily required in a variety of contexts.

See, e.g., Sierra Nevada Forest Protection Campaign v. Rey, 573 F.Supp.2d 1316, 1351 (E.D. Cal. 2008) ("Rey"); NRDC v. Forest Service, 634 F.Supp.2d 1045 (E.D. Cal. 2007); Wilderness Society v. U.S. Forest Service, 850 F.Supp.2d 1144 (D. Idaho. 2014).  In each of these cases, districts courts found that some level of dissemination of information and acceptance of comment short of the issuance of a draft EA was sufficient to satisfy NEPA's requirements to adequately inform the public and include the public to the extent practicable in the decision making process pursuant to 40 C.F.R. §§ 1501.4 and 1506.6.  Plaintiffs' complaint can be fairly read to allege both that Defendants violated NEPA by failing to issue a draft EA and that Defendants violated NEPA by failing to provide pre-decisional information that was available but not distributed during the final comment period.  Under Bering Strait, the issue before the court in this case boils down to a single question of whether Defendants' failure to provide the General BE to the public prior to the close of the comment period violated the NEPA-imposed duty to provide adequate pre-decision information to allow for informed public input.

        Plaintiffs contend the facts of this action align more-or-less exactly with those of Weingardt, and that a similar outcome is appropriate.  Defendants contend that Wingardt can be distinguished on the basis of the extent to which Forest Service provided Project-Specific information through public meetings, field trips, the Forum process and in scoping documents. In this regard, Defendants contend that they are entitled to summary judgment because Plaintiffs have failed to distinguish the facts of this case from similar fact patterns in Rey, NRDC, and Wilderness Society.  The core feature of Plaintiffs' claim of procedural error is the undisputed fact that the EA and the FONSI were based, to some extent on scientific studies that were not provided to the public but which were released to the public at such time it could reasonably be inferred that the studies could have been provided to the public with only a very modest delay in the decision timetable.  This fact places this case somewhat in line with the factual context of

Weingardt but differentiated from that case by the fact that evidence is lacking that the scientific studies were in the possession of the Forest Service during the comment period.

Of the cases cited by Defendants, one warrants close examination; not because it shares with Weingardt the feature of available environmental information not shared with the public, but because it takes a more incisive look at legal basis of the decision in Weingardt.  In NRDC v. Forest Service, 634 F.Supp.2d 1405 (E.D. Cal. 2007), the district court took considerable effort to determine whether the criticism by the Weingardt court against the Forest Service for the failure to provide information on the expected environmental impacts of the particular project under consideration, even though the Forest Service possessed such information, was the legal basis for the court's holding or whether it was dictum.  See id. at 1067 (presenting the parties' arguments as to the centrality of the failure to provide project specific environmental information in the Weingardt decision).  The NRDC court concluded that "in preparing an EA, the regulations only require that an 'agency shall involve the public, the extent practicable . . . .' 40 C.F.R. § 1501.4(b).  This court agrees with [the decision in Biodiversity Conservation Alliance v. United States Bureau of Land Mgmt., 404 F.Supp.2d 212, 220 (D.D.C. 2005)] that '[d]etermining whether the public was adequately involved is a fact-intensive inquiry made on a case-by-case basis.'"  NRDC, 634 F.Supp.2d at 1167.

The focal point of the "fact-intensive inquiry" is to determine whether the agency has taken the requisite "hard look" at the likely environmental consequences of its action.  See Town of Cave Creek, Arizona v. F.A.A., 325 F.3d 320, 327 (9th Cir. 2003).  The obvious goal of public participation is to avoid uninformed decisions affecting the environment.  It follows then that a court conducting a "fact-intensive inquiry" at agency decision-making should look both at the nature of the information that is alleged to not have been provided and to the information that the parties challenging the agency's decision placed before the agency.  The idea here is that a

court reviewing an agency decision under NEPA can only provide relief to a challenging party if it can be shown that information that was not before the agency would, if properly considered, present a "seriously different picture of the environmental landscape." Nat'l Comm. for the New River v. F.E.R.C., 373 F.3d 1323, 1330 (D.C.Cir. 2004); see also, High Sierra Hikers Ass'n v. Blackwell, 390 F.3d 630, 642 (9th Cir. 2004) (although injunctive relief is not automatic, it should issue if, as a result of NEPA violation uninformed decision is evident).

When the court examines the comments prepared by Plaintiffs in response to the 30-day final comment period, including the attachments to the comment by Center for Biological Diversity and Western Watershed Project, the court must concluded that Plaintiffs placed before Defendants all the information they intended Forest Service to consider. Essentially, Plaintiffs' substantive argument is that Forest Service's assessment of the environmental effects of high-intensity fire, even stand replacing fire, on sensitive old growth species such as the fisher and the spotted owl is erroneous. In particular, the attachment titled "Conservation Science Perspectives on Complex Early Seral Forests: What They Are and How To Manage Them in the Sierra Nevada Ecoregion" by DellaSala, Bond & Hansen presents a reasonably comprehensive case for permitting high-intensity stand replacing fires for the benefit of sensitive species such as the spotted owl. The Plaintiffs comments make clear their contention that the same policies favor the Pacific fisher as well. Further, it is clear from comments and responses in the EA, that Forest Service gave due consideration to Plaintiffs' contentions concerning the need for fuel reduction and responded to those contentions with references of their own.

The court finds it telling that Plaintiffs do not identify, either in their complaint or in their moving papers, any specific information that they would have included in their comments but did not because of the failure of Forest Service to provide the scientific reports that were not available during the comment period. They only generally contend that they were unable to

1
2
3
4
5
6
7
8
9
10
11
12

prepare comments that were adequately responsive.  Further, the court can finding nothing in

Plaintiffs' complaint, the Parties arguments, or in the Administrative Record that indicates that

information Plaintiffs could, or might have, placed in their responses at any point in the process

was of a nature that would "present a seriously different picture" of the environmental issues

being contested.  What is evident from consideration of the whole of the information provided is

that Plaintiffs preferred the third option (hand thinning only), Defendants preferred the second

option (some mechanical thinning), and that Defendants gave consideration to information that

included at least the substance of the information relied upon by Plaintiffs.  The procedural

requirements of NEPA demand no more than that.  See Weingardt, 376 at 990 ("NEPA is

designed to ensure a process and not to produce a particular result").

13
14
15
16
17
18
19
20
21
22
23
24

        The court finds that the specificity and scope of information Plaintiffs did provide in their

comments shows that they were adequately informed of the issues to provide sufficient

information to permit the requisite "hard look" by Defendants.   Defendants are therefore entitled

to summary judgment.  The court feels it is worth noting that the court's decision does not

amount to an endorsement of Defendants' decision to not issue a draft EA or to use unreleased

scientific reports to support its final EA.  What tips this rather close case in favor of Defendants

is the lack of any evidence that, had Plaintiffs been informed of the scientific reports

underpinning the final EA prior to its finalization, they would have been able to put information

before Defendants that would have been substantially different from what the Defendants did

consider.

25
26
27
28

        THEREFORE, for the reasons set forth above, it is hereby ORDERED that Defendants'

motion for summary judgment is hereby GRANTED.  Plaintiffs' motion for summary judgment

is correspondingly DENIED.  Defendants' motions to strike are GRANTED to the extent set

1    forth above.  The motion of Sierra Forest Products to appear as amicus curiae is DENIED.

2

3

4    IT IS SO ORDERED.

5    Dated:   September 25, 2014          _____

6                                        SENIOR  DISTRICT  JUDGE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28